[Cite as *State v. Reynolds*, 2024-Ohio-1835.]

IN THE COURT OF APPEALS OF OHIO

TWELFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | Butler No. CA2023-04-0043 |
| v. | | (Butler No. CR2022-02-0162) |
| | : | |
| Roger Reynolds, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on May 13, 2024

**On brief:** *Dave Yost*, Attorney General, and *Bradford L. Tammaro*, and *Drew Wood*, Special Prosecuting Attorneys, for appellee. **Argued:** *Bradford L. Tammaro*.

**On brief:** *Taft Stettinius & Hollister LLP*, *Chad R. Ziepfel*, *Aaron M. Herzig*, and *Annie M. McClellan*, for appellant. **Argued:** *Aaron M. Herzig*.

APPEAL from the Butler County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Roger Reynolds, appeals the judgment of the Butler County Court of Common Pleas following a jury trial and finding of guilt of one fourth-degree felony count of having an unlawful interest in a public contract under R.C. 2921.42(A)(1). Reynolds was acquitted by the jury of four other charges, including two other separate felony charges of R.C. 2921.42(A)(1), felony bribery under R.C. 2921.02(B), and one count of unlawful use of the authority of office, a misdemeanor of the first-degree under R.C. 102.03(D).[1]

{¶ 2} Although all of the asserted offenses related to Reynolds' activities while serving as the Butler County Auditor, the charges of which he was acquitted all arose from

---

[1] A fifth charge was dismissed at the request of the state prior to jury selection. (*See* Dec. 12, 2022 Tr. at 2-3.)

his alleged attempts to secure Property Tax Increment Financing that would allegedly have personally benefited him or members of his family.[2] The sole count for which Reynolds was convicted was factually distinct from and added to his original charges in a superseding indictment filed five months after his initial indictment was returned. In that count, the state generally asserted that Reynolds:

> [D]id, while serving in the position of Butler County Auditor, knowingly authorize or employ the authority or influence of the Auditor's office to secure authorization of a public contract, to wit: a "partnership" with the Four Bridges Country Club to assist in building a golf academy, further. the Auditor, a member of the Auditor's family, or the Auditor's business associate(s) had an interest in the development of said partnership and/or did have an interest in the benefits of a public contract that would redirect monies returned to the School District by the Auditor's Office for the proposed partnership. [sic.]

*State v. Reynolds*, CR2022-02-0162, Aug. 25, 2022 "State of Ohio Second Bill of Particulars" at 6. The evidence presented at trial demonstrated that this "Four Bridges Proposal" never went beyond early discussions from December 2016 through February 2017.

{¶ 3} The first time the proposal was raised by Reynolds was in December 2016, during a closed-door discussion with Lakota School District Treasurer Jenni Logan, following a more open meeting to discuss bond millage rates. At the end of the bond millage meeting, Reynolds asked the other participants to leave the room so he could speak to Logan privately. Reynolds then proposed that the auditor's refund of unspent tax money to the Lakota School District should be used to build a golf academy at Four Bridges Country Club.

---

[2] These charges took up the vast majority of the trial and were the main focus of the state's case. *Compare e.g.*, Dec. 13, 2022 Tr. at 14-44 (state's opening statement discussing Counts 1 through 4) with *id.* at 44-46 (state's opening statement discussing Count 6). Count 1 related to allegations that he had attempted to gain approval for a development that would occur on land his father owned and that he allegedly planned to sell to the developer at a vastly inflated price and/or insisting on employment as a "consultant" by the developer. Count 2 related to allegations that he had lobbied for approval of a Tax Increment Financing ("TIF") proposal designed to provide funding for infrastructure that would permit the development of property he or his family owned. Count 3 related to allegations that he had caused the removal of a neighbor's property from an agricultural use valuation program, resulting in a significant increase in that neighbor's tax burden, in order to benefit his own interest in adjacent property. Count 4 arose from allegations regarding the same TIF property classifications described in Count 2. And Count 5 (which was dismissed prior to trial) alleged that he had promised a campaign donation to a township trustee in connection with a vote to approve that same TIF. *See* Second Bill of Particulars in *State v. Reynolds*, No. CR2022-02-0162.

> Initially, Defendant Reynolds told Ms. Logan that there would be a refund of the fee money. However, following that announcement the Defendant stated that, while he had never given his thoughts on how that refund money should be spent, in this instance, he now had ideas on how the money should be spent. The idea put forth by Defendant Reynolds was that the Lakota School District should use the money to build a golf academy for the golf students at the Four Bridges Golf Club. Indeed, Defendant Reynolds proposed the School District use $250,000.00 dollars of the anticipated refund money for the next three years, a total of $750,000.00 dollars, to build the golf academy at a private golf course.

> Several factors flowing from the "suggestion" by the County Auditor generated concerns by the School District Treasurer. First, while not a lawyer, Ms. Logan's understanding was that building a facility on private property for a school district was not permitted. *Ms. Logan identified that the Defendant's "suggestion" raised the specter of a conflict of interest. Ms. Logan was aware that Defendant Reynolds lived in the Four Bridges neighborhood. Ms. Logan was aware that Defendant Reynold's* [sic] *daughter was on the golf team at Lakota High School. Moreover, the High School Golf Coach was also the Golf Pro at the Four Bridges Golf Club.*

(Emphasis added.)  *State v. Reynolds*, case No. CR2022-02-0162, Jan. 30, 2023 "State Sentencing Memo" at 3.  A second meeting between Reynolds and Logan, in January 2017, was also attended by Lakota School District Chief Operations Officer Chris Passarge and Gene Powell, the golf pro employed at Four Bridges Country Club who also served as the Lakota East High School golf coach.  At that meeting, Reynolds proposed taking $250,000 a year for three years, totaling $750,000, to build a facility at Four Bridges Country Club, that the golf team could use as a winter practice facility and academy.  Logan advised Reynolds that the district could not use public dollars to build a building on private property, and then Reynolds suggested a few different ways that a transaction might be structured to address this concern.  Notably, Logan had no authority to formally propose or approve the contract—both of those actions would have to be taken by the School Board. Still, Reynolds' proposal made Ms. Logan uncomfortable, and she told Reynolds and Powell that she was going to have to get an opinion from legal counsel before anything moved forward.  (Dec. 16, 2022 Tr. at 66.)

{¶ 4}    On February 1, 2017, Logan sent an email to the school district's attorney at the Bricker and Eckler law firm describing the Four Bridges Proposal and requesting a legal opinion. *Id.* at 33-37. Ultimately, the attorney rejected all the proposed options, describing problems both legal and practical that would arise from each. *Id.* at 37-40. Although Reynolds had falsely suggested to Logan that he had received a different opinion from his legal adviser at the county prosecutor's office, these legal and practical concerns were communicated to Reynolds by the district attorney at a third meeting over a conference call in mid-February. *Id.* at 42-44.

Q: And then, you talked a little bit about a follow up meeting that you had with Mr. Reynolds and Mr. Powell --

A: Um-hum.

Q: -- correct, where they came to your offices for a phone call with the lawyer?

A: Yes.

Q: Okay. And the point of that meeting was for the lawyer to explain to Mr. Reynolds and to Mr. Powell his opinion; fair --

A: Correct.

Q: -- to say?

A: Yes.

Q: And that incident, you go and you talk to the lawyers, the lawyers explain this to Mr. Reynolds and Mr. Powell, that was the end of it; is that fair?

A: Yes.

Q: So after that, the idea just died, right? It didn't go any further?

A: Correct.

Q: So Mr. Reynolds proposed the idea. Everybody said, well, we got to run it by legal to see if it's legal first. And if it is, then we'll talk about whether it's a good idea, right?

A: Um-hum.

Q: Is that correct?

A: Um-hum.

Q: And then, you guys ran it by legal. Legal said, can't do it that way, not a good idea. None of these are good. Don't do it. And the idea --

A: Correct.

Q: -- died?

A: Correct.

Q: Is that a fair summary?

A: That's a fair summary.

Q: So over the course of all these interactions, Mr. Reynolds never threatened to withhold funding from the school district over this?

A: No.

Q: He never said he wasn't going to hold back those tax advances you talked about?

A: No.

*Id.* at 69-71.

{¶ 5} As Logan testified, nothing further happened with the Four Bridges Proposal—"I never received a different legal opinion from the Prosecutor's Office, and it kind of went away." *Id.* at 44. The state presented no additional evidence at trial that the proposal was pursued further, and according to Logan's testimony, it was never even presented to the School Board, the entity that had the authority to approve or reject the proposal. *Id.* at 50. Moreover, it was apparently never even reduced to writing. *Id.* at 50-51. Logan further testified that Reynolds never made an ultimatum regarding the proposal, and that the School District had received all of the tax refund monies to which it was entitled during her 11 years as the district's treasurer. *Id.* at 52-53. Moreover, Logan never reported the proposal or the discussions to law enforcement. She was instead first contacted by the state to discuss her memories of the proposal in June 2022—some five years later, and approximately one month before she retired from the Lakota School District. *Id.* at 74-75.

{¶ 6} Based almost exclusively on the testimony of Logan, Reynolds was indicted for and ultimately convicted of a violation of R.C. 2921.41(A)(1), having an unlawful interest

in a public contract.  Following the close of the state's case, the defense moved for a judgment of acquittal on that charge:

> MR. ZIEPFEL: That's okay. The Defense would also move for judgement of acquittal under Rule 29 of Count VI. This is another unlawful interest in a public contract count related to the Lakota, Four Bridges fact pattern.
>
> Judge, I think the only witness who testified about this was Jenni Logan. And her testimony was that Mr. Reynolds presented her with an idea, that she said, we need to run it by the lawyers first, they ran it by the lawyers, and then the whole idea died.  So the elements of this are the same as they were for Counts II and IV: knowingly employ the influence of the public official's office to secure authorization of a public contract in which the public official or a member of his family has a interest.
>
> We think the same elements are not satisfied here.  I don't think that there's any evidence that he employed the influence of his office to secure the authorization of any public contract. She testified that he had an idea; he proposed it.  She did testify that the first time it was brought up, it was after a meeting where they were talking about county business on Villa's rates, or something to some effect. Mr. Reynolds drew a line between that and asked people to leave the room; spoke to her about what he considered to be a personal issue that he was going to raise, right, an idea; proposes the idea to her; doesn't make any threats; doesn't say, do this or else you're not going to get your refunds. We didn't hear anything like that.
>
> They go on, they have another meeting at Lakota. There's four folks there, one of whom is the club pro at Four Bridges, who also happens to be the Lakota golf coach. They again propose the idea. Ms. Logan testified that their response -- the Lakota side of things' response to it was, we need to run it by the lawyers, and then we'll talk about whether we should do this. Let's see if it's legal, first, to use the money in this way, and then we'll have a conversation about whether we should do it.
>
> They have a conversation with the township's lawyers -- or excuse me, the school board's lawyers. Mr. Reynolds comes in, along with Mr. Powell, to have a conversation, right, with the lawyers. The lawyer explains to him why it's a problem. And her testimony was, the whole thing died.
>
> I don't think based on that testimony and that single witness, what she had to say, that any reasonable juror could find that

> Mr. Reynolds was knowingly employing the influence of his office to secure authorization of a public contract.

(Dec. 19, 2022 Tr. at 254-56.) The trial court denied the motion, indicating it was a "question of fact for the jury, not a matter of the law." *Id.* at 258-59. The court instructed the jury as to the general elements of Count 6 as follows:

> THE COURT: Count VI, having an unlawful interest in a public contract. The Defendant is charged with having an unlawful interest in a public contract (Four Bridges Golf Academy). Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about January 17, 2017, and on or about January 31, 2017, in Butler County, Ohio, the Defendant, a public official, did knowingly employ the influence of the public official's office to secure authorization of any public contract in which the public official, a member of the public official's family, or any of the public official's business associates has an interest, in violation of the Revised Code Section.
>
> The State charged that the offense took place between on or about at least January 1 of '17 and on or about January 31 of '17. It is not necessary that the State prove the offense was committed on the exact day as charged in the indictment. It is sufficient to prove that the offense took place on a date reasonably near the date claimed.
>
> The definitions for Count VI are the same as for Count II.

(Dec. 20, 2022 Tr. at 190.) Regarding those definitions, the court had previously defined "public official" for the jury as "any elected or appointed officer or employee or agent of the state, or any political subdivision thereof, whether in a temporary or permanent capacity." *Id.* at 184. The court's instructions also defined "contract" as an:

> [A]greement or obligation, whether oral, written, or implied, in which one party becomes obligated to another to pay a sum of money or to perform or omit to perform a certain act or acts. It is not necessary that the parties use any particular words, perform any particular acts, or use any particular form of agreement in order to create a contract * * *. It is not necessary for the contract to come into existence.

*Id.* at 185-86. And finally, the instructions defined "public contract" as:

> [T]he purchase or acquisition or a contract for the purchase or acquisition of property or services by or for the use of the state or any of its political subdivisions or any agency or

> instrumentality of either, including the employment of an individual by the state, any of its political subdivisions, or any agency or instrumentality of either; or b, a contract for the design, construction, alteration, repair, or maintenance of any public property.

*Id.* The jury convicted Reynolds on Count 6 only. Reynolds then filed a written motion for judgment of acquittal, which the trial court denied. The court observed that Reynolds "makes four arguments to support this motion" and rejected each argument:

> First, that no cont[r]act was formed or authorized. However, R.C. 2921.42 does not require proof that a contract was formed or authorized.
>
> Second, that because no contract was formed one cannot determine it to be a public contract. However, as stated above, contract formation is not required and the evidence presented showed conclusively that the Defendant proposed the purchase or acquisition of property or services by, the Lakota School District, a political subdivision of the State of Ohio. Defendant's proposed purchase or acquisition meets the definition of public contract in ORC 2921.42(I)(1). The jury was free to so find.
>
> Third, that the defendant did not use the authority or influence of the Auditor's office to secure authorization of any contract. To the contrary, the record is replete with evidence of the Defendant's behavior. Some behavior was subtle. Some not so subtle. The jury was free to use said evidence and inferences drawn there from, to determine if the defendant used the authority and influence of his office to secure authorization of the proposed cont[r]act.
>
> Finally, the defendant argues that neither he, nor a family member nor a business associate had an interest in the public contract. Once again the record is replete with evidence which the jury could use to settle this issue.
>
> Accordingly the Court finds the jury's verdict to be based on sufficient evidence.

(Jan. 27, 2023 Decision & Entry at 2.)

{¶ 7} Reynolds then filed a motion for new trial, alleging he had been deprived of exculpatory evidence relating to the Four Bridges Proposal. (Feb. 8, 2023 Def.'s Mot. for New Trial Based on *Brady* Violation & New Evidence.) The motion argued that an April 26, 2017 email from Powell to the owners of Four Bridges would have changed both the

defense's trial strategy and the jury's verdict on Count 6. Reynolds argued the email directly contradicted the key testimony given by Logan. Reynolds further contended that with the email available to refresh his recollection about matters which occurred nearly six years prior, the defense would have called Powell to testify that he, not Roger Reynolds, was leading the project; that the partnership idea had multiple supporters at Lakota; and that the partnership would last ten years and could cost Lakota as little as $300,000. *Id.* at 1-2. The trial court also denied that motion:

> The April 26, 2017 email does contain matters that are not discussed in the audio recording. However many items are discussed on the recording and the Defendant cannot meet his burden under Rule 33 to show that said evidence has been discovered since the trial and could not, in the exercise of due diligence, have been discovered before the trial. The defendant had the recording and with due diligence could have interviewed the witness and obtained their evidence. Furthermore, the information in the email and not on the tape does not disclose a strong probability that it would change the result if a new trial is granted because it is not material to the issues, it is cumulative to former evidence and does not impeach the State's only witness, Jenni Logan, or contradict the former evidence.

> The email is mainly the opinion of Gene Powell. He opines that the school district is interested in the project. He met with school district representatives and they are "on board." This fits precisely with the testimony of Jenni Logan. She testified that members of the school district did not privately support the project but publicly avoided expressing lack of support because they did not want to upset the Defendant, County Auditor Roger Reynolds. Furthermore, the email is dated 4/26/17. The evidence connecting the Defendant to the crime showed his last involvement to be in mid February, some two months before the email. Gene Powell's later proposal to the management of [F]our Bridges has nothing to do with Jenni Logan's trial testimony.

> * * *

> The 4/26/17 email contains information that was provided to the Defendant in the 5/10/22 Powell audio. The information not provided in the audio is not material. Accordingly there are no Brady violations and no grounds proven to support a New Trial under Crim.Rule 33.

(Mar. 17, 2023 Decision & Entry at 3, 5.) The court proceeded to sentencing, and this timely appeal followed. Reynolds now asserts four assignments of error with the trial court's judgment.

> **First Assignment of Error:** The trial court erred by failing to dismiss Count 6.

> **Second Assignment of Error:** The trial court erred by concluding that sufficient evidence existed to support Reynolds' conviction.

> **Third Assignment of Error:** The trial court erred by failing to grant a new trial under *Brady*.

> **Fourth Assignment of Error:** The judgment of the trial court is against the manifest weight of the evidence.

{¶ 8} We will address Reynolds' first and second assignments of error together, as both essentially argue that both the evidence and a proper understanding of R.C. 2921.42(A)(1) demonstrate that Reynolds could not be convicted of violating the statute on these facts.[3]

{¶ 9} R.C. 2921.42(A)(1) provides that "[n]o public official shall knowingly * * * [a]uthorize, or employ the authority or influence of the public official's office to secure authorization of any public contract in which the public official, a member of the public official's family, or any of the public official's business associates has an interest," and pursuant to *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307 (1979).

---

[3] The state does not contend that Reynolds could be convicted under any other subsection of R.C. 2921.42(A), and the jury was not instructed regarding those subsections. We observe that a violation of R.C. 2921.42(A)(2) would have required Reynolds, his family members or business associates to have an interest in a security in which public funds were wrongly invested; that R.C. 2921.42(A)(3) would have required Reynolds to "occupy [a] position of profit" with the private entity that was party to a public contract; that R.C. 2921.42(A)(4) would have required Reynolds to have been specifically connected to the public entity that entered into the contract and also have an interest in the profits or benefits of the private party to the contract; and that R.C. 2921.42(A)(5) related only to contracts where competitive bidding is required by law. The facts here as we understand them could not support a conviction of Reynolds under any of those alternative subsections.

{¶ 10} In attacking his conviction, Reynolds first argues the evidence is insufficient to demonstrate that he "employed the authority or influence of [his] office" in relation to the Four Bridges Proposal. Second, he asserts that neither he, nor any member of his family, nor any of his business associates, had "an interest" in the Four Bridges Proposal. Finally, he asserts he did not "secure authorization of any public contract" as required under the statute, because no public contract was ever "secured" or "authorized." We will address each argument in turn.

{¶ 11} Although the evidence that Reynolds "employed the authority or influence of [his] office" in seeking approval of the Four Bridges Proposal is not terribly strong, there is sufficient evidence in Logan's testimony to support the jury's verdict as it relates to this aspect of the statue. Reynolds' action in clearing the room prior to raising the Four Bridges Proposal to Logan after the December 2016 bond millage meeting, his shifting alternative proposals during the January 2017 meeting, and his apparent dishonesty in suggesting that he had obtained a different legal opinion than that presented by the School District's attorney regarding the Proposal are facts based upon which a rational jury could have concluded that to indicate Reynolds was, at least, using the soft pressure of his office to advance the Four Bridges Proposal. Logan specifically testified about the practical necessity for the School District to maintain a good relationship with the county auditor:

> Q: The Defense asked some questions about -- to the effect of, did you ever tell the Defendant that you thought this was a bad idea? Did you express that you thought that this was a bad idea; do you recall those questions?
>
> A: Yes.
>
> Q: Why didn't you tell the Defendant that Lakota schools thought this was a bad idea, and you didn't want to spend your money that way?
>
> A: I didn't want to make him mad.
>
> Q: Why didn't you want to make him mad?
>
> A: Because I -- I worried if I made him mad -- I was always looking out for -- I didn't want anything that I did -- or to make someone mad that then it would come back on the district or on the students that I served. So there were a lot of times I held my tongue and/or kept my opinion to myself. And this was one.

(Dec. 16, 2022 Tr. at 73-74.) "Public officials authorize or use their public position to secure authorization of public contracts, under Division (A)(1), if they vote on, deliberate on, recommend, *formally or informally lobby for*, or take any other official action on the contracts." (Emphasis added.) Ohio Ethics Commission, Advisory Opinion No. 88-008, 1988 Ohio Ethics Comm. LEXIS 26, quoted in *State v. Mieczkowski*, 7th Dist. No. 17 JE 0016, 2018-Ohio-2775, at ¶ 23. *Compare with* Ohio Ethics Commission, Advisory Opinion No. 92-004, 1992 Ohio Ethics Comm. LEXIS 44, paragraph 3 of the syllabus. There is sufficient evidence in Logan's testimony for a rational juror to conclude that Reynolds was informally lobbying for the adoption of Four Bridges Proposal, and that he was "employ[ing] the authority or influence of [his] office" to do so. R.C. 2921.42(A)(1). Accordingly, this argument lacks merit.

{¶ 12} Reynolds next contends that the trial evidence demonstrates neither he, nor any member of his family, nor any of his business associates had an "interest" in the Four Bridges Proposal. Although there is scant evidence in the record how long it would take to establish the golf academy and complete the Four Bridges Proposal, Logan admitted that it was "fair" to say that even though Reynolds' daughter was on the golf team, that because she was a senior at the time Reynolds first advanced the proposal to Logan it was "pretty likely that daughter is not going to be in high school anymore playing on the golf team by the time that academy gets built." (Dec. 16, 2022 Tr. at 67.) While Powell might personally benefit from the Four Bridges Proposal as he was both the Lakota golf coach and the golf pro at the country club, the record does not establish any business relationship between Powell and Reynolds. But because it is undisputed that Reynolds was a member of the club and owned property near it that might benefit from the presence of the golf academy, we must conclude that a reasonable juror could find that he had a minimal "interest" in the Four Bridges Proposal. Accordingly, this argument lacks merit as well.

{¶ 13} But Reynolds' primary objection under his first two assignments of error is that he could not have "secure[d] authorization of any public contract," because no public contract was ever authorized. As Reynolds has observed in his reply brief, the state has "failed to point to a *single* Ohio case in which a defendant has been convicted for violating R.C. 2921.42(A)(1) *when no secured, authorized contract exists*. The State could not point to one because a secured, authorized contract is an element of the offense, so always necessary for conviction." (Emphasis sic.) (Corrected Reply Brief at 1.)

{¶ 14} It is undisputed that no written Four Bridges Proposal was ever presented to the School District, (Dec. 16, 2022 Tr. at 50-51), that Logan herself could not approve or adopt the proposal, *id.* at 49, that the Lakota School Board never formally discussed or considered the proposal in any form, *id.* at 50, that Logan never chose to report anything about the proposal to law enforcement authorities until she was specifically requested by them to talk about it over five years later, *id.* at 74, and that the Four Bridges Proposal was abandoned within months after Reynolds first suggested it to Logan, *id.* at 68-70.

{¶ 15} Reynolds argues this evidence establishes he cannot be convicted under R.C. 2921.42(A)(1). The state's case regarding the proposal rests entirely on Reynolds' discussions with Logan—Reynolds engaged in no other conduct that would permit the imposition of criminal penalties against him.  In arguing that the evidence is sufficient to impose criminal liability on Reynolds, the state has analogized violation of R.C. 2921.42(A)(1) to bribery, and cites *Curtis v. State*, 113 Ohio St. 187, 191 (1923), for the proposition that the offense of bribery "is complete upon payment of the money, if the object of its offering and payment is to influence the official in the performance of his duties, and it is immaterial that he fails to carry out his part of the compact or that he has no opportunity to do so."

{¶ 16} But this analogy fails. The payment of a bribe is itself a corrupt voluntary act, which is a necessary requirement for criminal liability in this state.  *See* R.C. 2901.21(A)(1) ("[A] person is not guilty of an offense unless * * * [t]he person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing.").  The state does not demonstrate—indeed, it has not even alleged—that Reynolds has performed some other act that could form the basis of his conviction. Instead, the state argued, and the trial judge held, that "R.C. 2921.42 does not require proof that a contract was formed or authorized."  (Jan. 27, 2023 Decision & Entry at 2.)  Moreover, the court specifically instructed the jury that it was "not necessary for the contract to come into existence."  (Dec. 20, 2022 Tr. at 186.)

{¶ 17} But this interpretation is plainly incorrect—R.C. 2921.42(A)(1) specifically requires that the public official must "employ the authority or influence of the public official's office *to secure authorization* of any public contract," and R.C. 2921.42(I)(1) defines "public contract" as

> (a) The *purchase or acquisition, or a contract for the purchase or acquisition*, of property or services by or for the use of the state, any of its political subdivisions, or any agency or instrumentality of either, including the employment of an individual by the state, any of its political subdivisions, or any agency or instrumentality of either; (b) *A contract* for the design, construction, alteration, repair, or maintenance of any public property.

(Emphasis added.) *Id.*

{¶ 18} Although it is in general true that the parties to a proposed contract may incur obligations to each other even in the absence of a completed contract, the term "contract" as it is used in R.C. 2921.42(I)(i) plainly demonstrates that the statute intends that a public contract must come into existence before criminal liability can be imposed under R.C. 2921.42(A)(1). And with good reason—unless a public contract actually comes into being— i.e., is "secure[d]" and/or "authorize[d]" as required by the plain language of that subsection of the statute—there has at most an *attempt* to violate R.C. 2921.42(A)(1). *Compare* R.C. 2923.02(A) ("No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, *shall engage in conduct that*, *if successful*, would constitute or result in the offense."). If the statute operated as the state suggests, it would sweep all manner of legitimate discussions by public officials into its ambit.

{¶ 19} Our conclusion is supported by the staff notes of the statute:

> The purpose of this section is to insure [sic] that public agencies stand on at least an equal footing with others *with respect to necessary business dealings*. Accordingly, the section does not prohibit public servants from all dealings in which they may have some interest, no matter how remote or above-board. It prohibits only those dealings in which there is a risk that private considerations may detract from serving the public interests. Thus, there is no violation of this section where a public servant's connection with a contracting party is as a stockholder or creditor with a strictly limited stake which is fully revealed, provided there is no purpose to defraud. Similarly, there is no violation of the section when obtaining necessary supplies or services from a contractor in which a public servant has an interest, as part of a course of dealing established before the public servant assumed office, provided the transaction is at arm's length, and provided the agency's

> only alternatives to dealing with the contractor are to pay more
> or do without the supplies or services involved.

(Emphasis added.)    R.C. 2921.41, *1974 Committee Comment to H 511.*    *See also Mieczkowski*, 2018-Ohio-2775, at ¶ 25 (quoting staff notes and observing "the notes of the statute do indicate there is not a blanket prohibition on having an interest in a public contract").  The language of the staff note presumes that a public contract has been entered into by the parties subject to the statute and describes instances in which entering into such agreements or obtaining such goods or services would *not* constitute a violation of the statute.  If the reach of the statute were as broad as the state argues, surely this would have been mentioned as well.

{¶ 20} The concurring opinion rejects that the conclusion that the statute does not cover attempts to "secure" or "authorize" a contract, and instead argues that the statutory language is ambiguous.  (*See infra* decision concurring in judgment at ¶ 23.)  We disagree.  The language is carefully drafted and clear, and there is an obvious reason that statute is worded as it is—if the statute covered attempts as well as actions, legislators engaging in their normal everyday work would be a primary target for criminal prosecution.  When performing their official duties, local and state elected officials frequently advocate that the state engaged in actions that might personally benefit them in some fashion, even though personal benefit is not the primary reason behind the suggestion.  But as the staff note indicates, the statute "prohibits only those dealings in which there is a risk that private considerations may detract from serving the public interests."  When a public official is simply discussing a topic that would arguably create a private benefit, even when doing so in the course of their official duties, there is no such risk.  It is, for example, well-known that legislators engage in "horse-trading" discussions during state budget negotiations—how many of those discussions would violate the statute under the "ambiguous" reading proposed by the concurrence?

{¶ 21} Here, the state's contention that Reynolds attempted to use his influence as the county auditor to secure a proposal for a public contract that might have benefitted him—there is simply no other way to construe either the charges or the evidence supporting them.  But even if the jury believed that Reynolds improperly attempted to secure a contract, his attempt *failed*—it was, in fact, thwarted by the only witness against him, Logan.  Logan clearly and repeatedly testified she doubted the legality and wisdom of the

proposal, and that she sought advice to convince Reynolds of its inadvisability, including advice from the Lakota School District's attorney. And it is undisputed that after a conference call with the school district's attorney, Reynolds abandoned his efforts to obtain approval of the proposal. *See, e.g.*, Dec. 16, 2022 Tr. at 69-71 (testimony of Logan). And crucially, Logan herself had no authority to secure the contract that would have enacted the Four Bridges Proposal—it is undisputed that such authority rested with the Lakota School Board, and there is no evidence the Reynolds ever talked to any of the board members regarding the Proposal. Even assuming Reynolds had some corrupt motive, the discussions about the Four Bridges Proposal occurred in late 2016 and early 2017, the Proposal itself was almost immediately abandoned, and the charges did not appear until late 2022, after Logan was contacted by law enforcement. On these facts, it is ultimately impossible to establish that Reynolds employed the authority or influence of his office to secure the authorization of a public contract in which he had an interest. We must conclude both that Reynolds' conviction for violating R.C. 2921.42(A)(1) was not supported by sufficient evidence, and also that the trial court erred by denying Reynolds' Crim.R. 29(C) motion for judgment of acquittal.

{¶ 22} For the foregoing reasons, Reynolds' first and second assignments of error are sustained. Reynolds' third and fourth assigned errors are overruled as moot. The judgment of the Butler County Court of Common Pleas is reversed, and this case is remanded to that court with instructions to sustain the Crim.R. 29(C) motion and discharge the defendant.

*Judgment reversed.*

JAMISON, J., concurs.
DORRIAN, J., concurs in judgment only.

DORRIAN, J., concurring in judgment only.

{¶ 23} I agree with the majority that the evidence in this case was sufficient for a rational juror to conclude Reynolds had an interest in the Four Bridges Proposal and employed the authority or influence of his office by "informally lobbying for the adoption of" it. (Majority opinion at ¶ 11-12.) I disagree, however, with the majority's interpretation of the phrase "to secure authorization of" in R.C. 2921.42(A)(1) and believe that phrase reasonably can be interpreted to mean taking some action in an effort to obtain a public

contract, as Reynolds did in this case, regardless of whether a contract ultimately is entered. Because I find R.C. 2921.42(A)(1) to be ambiguous and susceptible to different reasonable interpretations, the rule of lenity dictates that we construe the statute strictly against the state. Accordingly, I concur in the majority's judgment, but not in its reasoning.

{¶ 24} The majority reasons that a public official cannot secure authorization of any public contract until a contract is entered; therefore, the majority concludes that "a public contract must come into existence before criminal liability can be imposed under R.C. 2921.42(A)(1)." (Majority opinion at ¶ 18.) The majority's reading of R.C. 2921.42(A)(1) makes criminal liability contingent on a public official's *success* in influencing official action. I believe instead that a proper construction of R.C. 2921.42(A)(1) focuses on the actions taken by a public official, not on the efficacy of those actions. Under such a framework, the crime is complete when the public official takes some action using the authority or influence of his office in an effort to obtain a public contract, regardless of whether the contract ultimately is entered.

{¶ 25} In support of its conclusion, the majority cites the committee notes to the statute, finding that the language of the staff note presumes the existence of a completed contract. (Majority opinion at ¶ 19.) However, the staff note also indicates that the statute prohibits "dealings in which there is a *risk* that private considerations may detract from serving the public interests." (Emphasis added.) R.C. 2921.42, *1974 Committee Comment to H. 511*. The risk that a public official will place his private interests above the public interest is not limited to scenarios where a contract is entered. That risk also arises in a case like this one, where Reynolds advocated for a project he had a personal interest in, even though the project ultimately did not occur. The legislative intention to prevent improper use of authority or influence is also reflected in the fact that the statute imposes a harsher penalty for violating subsections (A)(1) and (2), which involve the use of a public official's authority, than it does for subsections (A)(3) through (5) of the statute. R.C. 2921.42(E).

{¶ 26} Several advisory opinions from the Ohio Ethics Commission that focus on the intended effect of a public official's actions, not the ultimate result of those actions, also lend support for a broader interpretation of R.C. 2921.42(A)(1) than the majority decision applies in this case. Ethics Commission advisory opinions are not binding on the courts, but "are entitled to weight by the courts." *State v. Urbin*, 100 Ohio St.3d 1207, 2003-Ohio-

5549, ¶ 13 (Moyer, C.J., concurring); *see State v. Mieczkowski*, 7th Dist. No. 17 JE 0016, 2018-Ohio-2775, ¶ 23 ("Ethics Commission opinions can be used as persuasive authority on the requirements of a statute."); *State v. Hunter*, 1st Dist. No. C-140684, 2016-Ohio-123, ¶ 19 ("Our reading of the statute comports with the position of the Ohio Ethics Commission on the matter.").

{¶ 27} In a 1994 opinion, the Ethics Commission considered whether a public school teacher who also owned and operated a commercial driving school was prohibited from receiving reimbursement from his school district for providing driver education to high school students. 1994 Ohio Ethics Comm. Advisory Opinion No. 94-002. The Ethics Commission concluded that R.C. 2921.42(A)(1) prohibited the teacher "from exercising the power and influence inherent in his position over students within the school district *to affect their choice* of a commercial driver training school." (Emphasis added.) *Id.* at 5. Thus, the teacher was prohibited from "discussing, *recommending*, or otherwise using the authority or influence of his position as a teacher, either formally or informally, in order to persuade students to utilize the services of his commercial driver training school." (Emphasis added.) *Id.* Similarly, when evaluating whether a city council member was prohibited from bidding on city construction contracts, the Ethics Commission concluded the city council member would be prohibited from voting to approve payments to his company under contracts entered into by other city officials or employees and "from recommending his company to other city officials or employees." 2000 Ohio Ethics Comm. Advisory Opinion No. 2000-02 at 6. In a later opinion, the Ethics Commission advised that R.C. 2921.42(A)(1) prohibited a member of the board of directors of a port authority from exercising the power and influence inherent in his office "to *affect the decisions* of other Authority officers and employees, and the Authority's legal counsel, to approve the application of the company that he serves as an officer." (Emphasis added.) 2001 Ohio Ethics Comm. Advisory Opinion No. 2001-02 at 10.

{¶ 28} These Ethics Commission opinions focus on the actions taken by the public official and state that a public official may not engage in conduct intended to affect whether a public contract is entered. By contrast, the majority's decision in this case effectively holds that R.C. 2921.42(A)(1) prohibits a public official from recommending or advocating for a public contract in which he has an interest if *and only if* the contract ultimately is entered.

{¶ 29} Holding that R.C. 2921.42(A)(1) prohibits actions taken to influence decisions regarding a public contract, regardless of the result of those actions, also is consistent with the approach taken by the First District Court of Appeals in a recent case involving former Hamilton County Juvenile Court judge Tracie M. Hunter. Hunter was convicted of violating R.C. 2921.42(A)(1) in connection with termination proceedings related to her brother who worked for the juvenile court's detention center. *Hunter* at ¶ 4. Hunter's brother was accused of hitting a youth in the detention center. *Id.* at ¶ 5. After the detention center superintendent recommended that Hunter's brother be terminated, Hunter contacted detention center officials and requested documents related to the youth involved in the incident. *Id.* at ¶ 8-9. The documents were provided to Hunter; she then gave the documents to her brother, who took them to his attorney. *Id.* at ¶ 11. Ultimately, Hunter's brother was terminated from employment with the detention center. *Id.* at ¶ 12.

{¶ 30} On appeal, Hunter claimed she could not be convicted of violating R.C. 2921.42(A)(1) because the statute referred to securing authorization of a public contract and therefore only prohibited interference with the initial hiring of a family member. *Id.* at ¶ 18. The First District held that "a violation of R.C. 2921.42(A)(1) includes not only interference with the initial decision to employ a family member, but also extends to other areas of employment, including termination proceedings." *Id.* at ¶ 21. Hunter further argued she could not be convicted of violating R.C. 2921.42(A)(1) because "her intercession was without fruit and no interference [with a public contract] occurred" due to the fact that her brother's employment was terminated. *Id.* at ¶ 23. The First District rejected this argument, concluding the violation of R.C. 2921.42(A)(1) "was complete, at the latest, when [Hunter] delivered the documents to her brother" because "[a]t that moment, [Hunter] had used her authority or the influence of her office to secure her brother's continued employment." *Id.* The court concluded that, for purposes of reviewing Hunter's conviction under R.C. 2921.42(A)(1), the outcome of her brother's termination proceeding was immaterial. *Id.* Thus, the First District's decision in *Hunter* rejected the same results—based reasoning adopted by the majority in this case.

{¶ 31} My disagreement with the majority about the meaning of the phrase "to secure authorization of" in R.C. 2921.42(A)(1) reflects ambiguity in the statute. " '[W]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.' " *State v. Young*, 62 Ohio St.2d 370, 374 (1980), quoting *United States v. Bass*, 404 U.S. 336,

348 (1971). This principle is known as the "rule of lenity" and is codified in Ohio law as R.C. 2901.04(A). That statute provides that, with limited exceptions, "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." "Under the rule [of lenity], ambiguity in a criminal statute is construed strictly so as to apply the statute only to conduct that is clearly proscribed." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶ 10. The rule of lenity is to be applied after all other tools of interpretation have been applied and ambiguity remains. *State v. Pribble*, 158 Ohio St.3d 490, 2019-Ohio-4808, ¶ 23.

{¶ 32} Other tools of interpretation do not resolve the ambiguity in R.C. 2921.42(A)(1), therefore I would apply the rule of lenity and hold that because the statute does not clearly proscribe Reynolds' actions he cannot be convicted under the statute. *See State v. Pendergrass*, 162 Ohio St.3d 25, 2020-Ohio-3335, ¶ 25 ("Because no sound textual argument resolves the facial ambiguity in the statute in favor of the state's interpretation, at the very least, Pendergrass prevails under the rule of lenity."). Because the majority reaches the same result, albeit for different reasons, I concur in judgment only.

———————————

Judges Laurel Beatty Blunt, Julia L. Dorrian, and Terri B. Jamison, of the Tenth Appellate District, sitting by assignment in the Twelfth Appellate District.

———————————